OPINION OF THE COURT
Charles Edward Ramos, J.
In this action to recover damages from an insolvent insurance carrier for unpaid claims, defendants Setnor Byer Bogdanoff, Inc. and Kaye Insurance Associates move pursuant to CPLR 3212 for summary judgment dismissing the action in its entirety. Setnor moves alternatively for dismissal of claims and cross claims against it for damages arising prior to March 28, 2000, and for dismissal of plaintiffs’ third cause of action for violation of New York Insurance Law and regulations.
Background
Plaintiffs are comprised of affiliated nightclubs (collectively Nightclubs) operating 70s-themed dance clubs in several states, including New York, referred to collectively as Polly Esther’s Nightclubs.[1] Lexington Insurance Co. previously provided Nightclubs with general liability and surplus lines insurance coverage. In December of 1998, Lexington communicated to the *377 Nightclubs that it was going to terminate the Nightclubs’ policy in March of 1999. Just prior to cancellation of the Lexington policy in 1999, Polly Esther’s Nightclubs contracted with fellow plaintiffs (and fourth-party defendants), Do The Hustle Inc., Do The Hustle LLC (collectively, Hustle) and Hustle’s owner, Timothy Ouellette, to perform various managerial and administrative duties including procuring insurance for the Nightclubs chain. Ouellette engaged defendant Kaye as insurance broker to render insurance brokerage services. Ken Haupert was appointed by Kaye as account manager for the Nightclubs’ account, and sought to place insurance for the Nightclubs with a new carrier. Kaye alleges that finding an insurance carrier for the Nightclubs was a difficult task, given the large risk involved in the nightclub operation business.
On March 23, 1999, after several informal communications with Ouellette, Kaye provided plaintiffs with two insurance proposals. The policy ultimately bound by plaintiffs and at issue in this action was submitted by Legion Indemnity Company, an insurance carrier Kaye alleges was rated “A” or “excellent” at the time the policy was bound, by the insurance industry’s standard rating reference, Best’s Insurance Reports. Legion was not, however, a carrier licensed to conduct insurance business in the State of New York, but rather a “non-admitted” “excess line” or “surplus line” carrier which, while able to issue premiums in the state, is not regulated by the New York Department of Insurance nor the State’s guaranty fund. Therefore, in the event that a nonadmitted carrier doing business in the state becomes insolvent, state guaranty funds are unavailable to cover outstanding insurance claims.
While plaintiffs allege in the first amended complaint that defendants did not explain the risks associated with binding coverage with a nonadmitted excess line carrier, plaintiffs do not dispute that Ouellette signed a letter sent by Kaye, dated April 21, 1999, and entitled “Notice of Excess Line Placement,” on May 10, 1999, thereby binding the Nightclubs to the Legion policy. In the letter, Haupert informed Ouellette of Legion’s nonadmitted status and the possible ramifications from a carrier holding that status, including exemption from New York insurance regulation and the inability to access state funds in the event of Legion’s insolvency. Ouellette signed the notification of excess line placement on May 10, 1999. A physical copy of the final policy was delivered to Ouellette and Hustle in September of 1999 by defendant insurance broker Setnor, following Set- *378 nor’s acquisition of the Nightclubs’ Legion account, along with other Kaye insurance accounts, pursuant to a purchasing agreement between Kaye and Setnor.
Under the Kaye-Setnor transaction, Setnor agreed to gradually undertake service of Kaye’s accounts leading up to a transfer of all client accounts, scheduled to take place in April of 2000. Subsequent to its acquisition of the account, Setnor renewed plaintiffs’ Legion policy for a second year-long term commencing on March 28, 2000.
In March of 2002, the Insurance Department of Pennsylvania announced that Legion had been ordered into rehabilitation, followed by a conservation proceeding in Illinois in April in response to the company’s insolvency. The Illinois conservation action later progressed to liquidation. Legion subsequently notified plaintiffs that, due to the carrier’s insolvency, Legion would be unable to cover costs related to defending or settling claims left outstanding at the time of liquidation.
The Nightclubs thereafter commenced this action naming Setnor as defendant, seeking estimated damages in excess of $1.7 million; Setnor subsequently impleaded Kaye, prompting plaintiffs to file an amended complaint naming both Setnor and Kaye as codefendants. Kaye then joined Hustle and Ouellette as fourth-party defendants in the current action, seeking contribution.
Plaintiffs’ amended complaint asserts three causes of action for breach of duty to exercise reasonable care in performance of duties, breach of contract, and failure to comply with applicable provisions of New York Insurance Law and Insurance Department regulations.
Defendant Kaye moves for summary judgment pursuant to CPLR 3212, or, in the alternative, for an order pursuant to CPLR 3211, dismissing the amended complaint in its entirety, in addition to all cross claims and third-party claims against it. Setnor cross-moves for summary judgment, dismissal of all claims against it in the entirety, or, alternatively, for damages arising prior to March 28, 2000, and dismissal of the claim for violation of New York Insurance Department Regulation 41 (11 NYCRR part 27).
Discussion
On a motion for summary judgment, made pursuant to CPLR 3212, the movant must demonstrate by admissible evidentiary proof that no disputed issues of material fact remain that would *379 otherwise warrant a trial. (Garrett v Unanimity Constr., 160 AD2d 546, 547 [1st Dept 1990].) Additionally, evidence submitted by the nonmovant in opposition to a motion for summary judgment will be given the benefit of every favorable inference. (Cruz v Apex Investigation & Sec. Co., 285 AD2d 427, 428 [1st Dept 2001].) Summary judgment is a “drastic remedy,” and will be granted only where no triable issues of fact can be identified. (Nojaim Bros, v CNA Ins. Cos., 113 AD2d 109, 114 [4th Dept 1985].) Further, while generally an evaluation of a motion for summary judgment made under CPLR 3212 does not involve determinations of fact or credibility, self-serving affidavits that directly conflict with a party’s own deposition testimony may be discounted. (Phillips v Bronx Lebanon Hosp., 268 AD2d 318, 320 [1st Dept 2000]; see also Perez v Bronx Park S. Assoc., 285 AD2d 402 [1st Dept 2001] [affirming summary judgment where a submitted affidavit clearly contradicted an earlier deposition].)
In opposition to Kaye’s motion to dismiss the amended complaint and summary judgment, and Setnor’s cross motion seeking the same, the Nightclubs argue that, in addition to stating cognizable legal claims, defendants’ affidavits introduce material issues of disputed facts on all claims that warrant a trial on the merits.
I. Negligence
A, Insurance Law Disclosure Requirements
The Insurance Law prohibits the sale of insurance underwritten by insurance carriers that are unauthorized[2] to conduct insurance business in this state. (Insurance Law § 2117.) The Legislature carved out a significant exception to this rule, however, permitting the sale of insurance underwritten by unauthorized carriers by certain brokers licensed to procure “excess line” or “surplus line” insurance from unauthorized carriers, for the purpose of widening the availability of insurance for otherwise uninsurable risks, provided that the excess line brokers adhere to strict statutory guidelines articulated in Insurance Law § 2118 and 11 NYCRR — Insurance.[3] (Insurance *380 Law § 2117 [h] [2]; Matter of John Paterno, Inc. v Curiale, 88 NY2d 328, 332 [1996].)
Excess line brokers have a statutorily imposed duty to “use due care in selecting [an] unauthorized insurer.” (Insurance Law § 2118 [a] [1].) Under the Insurance Law and regulations, “due care” is partially fulfilled by the broker’s compliance with various affirmative disclosure requirements. The Nightclubs maintain that defendants violated these disclosure requirements, specifically articulated in Insurance Law § 2118 (e) and 11 NYCRR 27.17 and 27.5, by not advising plaintiffs of Legion’s nonadmitted status, and that this noncompliance constitutes negligence per se.
Under the terms of Insurance Law § 2118 (e) (2) (C), a licensed “excess line” broker “shall provide written notice to the insured that the placement was made with an unauthorized insurer.”
The substance of this “written notice” is elaborated in the Insurance Regulations issued by the Department of Insurance, which provide that any insurance policy or insurance contract placed with an unauthorized insurer must bear a specified legend[4] alerting the insured to the insurer’s unauthorized status and its consequences (11 NYCRR 27.18 [a]), and additionally be stamped by the excess line association of this state, discussed below. (Insurance Law § 2118 [b] [6].)
Further, according to 11 NYCRR 27.17 (b), “[n]o excess line broker shall deliver, or cause to be delivered by a producing broker[5] . . . any . . . document evidencing insurance coverage, unless the document constitutes an insurance policy or contract *381 of insurance actually issued by the insurer . . . An exception to the above rule, barring an excess line broker, or (producing) broker working with the excess line broker, from transmitting any informal documentation relating to coverage placed with an unauthorized insurance carrier, provides that a producing or excess line broker may transmit to the insured written confirmation of placement of coverage, although not itself an insurance policy or contract, provided that the document contains the same specified legend that the insurance policy itself must bear. (11 NYCRR 27.17.)
Insurance Law § 2118 (b) further extends the affirmative duties of excess line brokers dealing in unauthorized insurance by requiring them to submit, within 45 days after a policy is procured from an unauthorized carrier, the declarations page of the policy or the policy binder to the excess line association of the state. (Insurance Law § 2118 [b] [3] [A].) The excess line broker must accompany this submission with an affidavit, written by herself or the producing broker, detailing that after “diligent effort” was made to place coverage with an authorized carrier, full coverage as requested by the insured could only be placed with an unauthorized insurer.[6] (Id.)
Finally, the “affirming broker,” as defined in the statute, meaning that broker who submits this affidavit to the excess line association, must additionally attach a copy of the written notice provided to the insured containing the specified legend, discussed at length above. (Insurance Law § 2118 [e] [2] [C].)
Under the provisions discussed, Kaye was under an affirmative obligation to obtain an excess line broker’s license,[7] (Insurance Law § 2105), file an affidavit with the excess line association detailing the “diligent effort” made to place coverage with an authorized carrier (Insurance Law § 2118 [b] [3] [A]) and, finally, Kaye was under an affirmative obligation to affix the specified legend discussed above on every document sent to the Nightclubs constituting an insurance policy or contract. (Insurance Law § 2118 [e] [2] [C]; 11 NYCRR 27.18 [a].) Additionally, *382 any other document sent to the Nightclubs constituting “written confirmation of placement of coverage” with Legion, as an unauthorized carrier, must have been affixed with same specified legend. (11 NYCRR 27.17 [b].) Finally, every document constituting an insurance policy or contract sent by Kaye to the Nightclubs must also have been stamped by the excess line association of this state. (Insurance Law § 2118 [b] [6].)
Kaye maintains that its letter of April 21, 1999, entitled “Notice of Excess Line Placement,” provided plaintiffs with sufficient notice of Legion’s unauthorized status and the consequences therefrom. Further, Kaye argues that as the Nightclubs did not receive the actual physical insurance policy until September 19, 1999 from Setnor, subsequent to Setnor’s acquisition of the Nightclubs account, the Legion policy was not actually bound until that date in September. However, inasmuch as the court can comprehend from Kaye’s inconsistent arguments, April 21, 1999, the date the notice of excess line placement was transmitted to plaintiffs, was the “legally operative date,” which presumably Kaye indicates can alternatively be considered the date of binding.
The Insurance Law defines a “binder” as “written evidence of a temporary insurance contract.” (Insurance Law § 2118 [f] [2] [B].) The Court of Appeals elaborated on the meaning of “binder,” defining it as a temporary insurance policy, effective in the interim from the date of application until a formal policy providing coverage is issued, but, ultimately, does not constitute part of the insurance policy, and is otherwise considered a distinct agreement from the policy issued subsequently. (Springer v Allstate Life Ins. Co. of N.Y., 94 NY2d 645, 649-650 [2000].)
Therefore, because a binder constitutes an insurance policy, albeit a temporary one, the specified legend must appear on its face, in compliance with 11 NYCRR 27.18 (a).[8]
The notice of excess line placement sent by Kaye to the Nightclubs on April 21, 1999, and signed by plaintiffs’ agent, Ouellette, on May 10, 1999, is the functional equivalent of a binder. Kaye itself characterizes this letter in its memorandum of law as a “legally binding agreement,” and that it “bound the Legion policy in 1999.” The letter further contains details sug *383 gesting it was intended to constitute a binder. The stated policy number (BIND 95292), for example, differs from the final policy number (GL1-0084162) appearing on the formal insurance contract delivered on September 19, 1999. Further, the letter indicates that “coverage ha[s] been placed by Kaye . . .” and the closing section requests the Nightclubs’ signature, “in consideration of your [Kaye] placing my [Nightclubs] insurance.” For these reasons, the notice of excess line placement is a binder consistent with the definition provided in Insurance Law § 2118 (f) (2) (B).
While the letter’s opening text does contain a header indicating that placement is being made with an unauthorized insurer, the court is unable to discern whether the phrases are in 10-point bold red font from the photocopied version submitted to the court, as required under 11 NYCRR 27.18 (a). Accordingly, the court is not prepared to rule on whether a violation of the applicable Insurance Law disclosure provisions occurred, insofar as Kaye is concerned.
Setnor argues in support of summary judgment, reiterating identical arguments as Kaye, and additionally urging the court to treat plaintiffs’ previous policy, also placed with an unauthorized surplus line carrier, Lexington, as evidence that plaintiffs were effectively on notice and advised of the nature and consequences of placement with an unauthorized carrier, thereby removing Setnor from any obligation to notify plaintiffs of Legion’s unauthorized status. As evidence that plaintiffs were on notice, at a minimum, of the consequences of placing coverage with an unauthorized carrier, Setnor directs the court’s attention to the Lexington policy in place prior to Kaye’s binding of coverage with Legion.
The Lexington renewal policy declarations page for the policy period March 26, 1997 to March 26, 1998, expiring just prior to Kaye’s placement of coverage with Legion, submitted to the court is stamped with a legend that reads, “This insurance is issued pursuant to the Florida surplus lines law. Persons insured by surplus lines carriers do not have the protection of the Florida Insurance Guaranty Act to the extent of any right of recovery for the obligation of an insolvent unlicensed insurer.”
While the placement of this legend on plaintiffs’ previous policy may constitute some evidence of knowledge on plaintiffs’ part of the nature and consequences of excess line coverage, it in no way discharges Kaye and Setnor’s affirmative disclosure obligations for excess line placement under the Insurance Law, *384 discussed at length above. Moreover, irrespective of both plaintiffs’ ratification of excess line coverage by Ouellette’s signature on Kaye’s notice of excess line placement and plaintiffs’ alleged knowledge of the nature of excess line coverage due to its previous coverage with Lexington, both brokers were required to comply with these disclosure obligations.
The Insurance Law does not provide an exception to these statutory disclosure requirements, rather the relevant provision clearly states that the specified legend appear on “every insurance policy” placed with an unauthorized carrier (11 NYCRR 27.18 [a]), and does not exempt brokers from complying where a previous policy, bound by a different broker, in a different state and with a different insurance carrier, as was the case with the Lexington policy, is proven to contain information alerting the insured to the nature and consequences of placement with an unauthorized carrier.
Neither does the Insurance Law make any distinction between a binder, the insurance policy itself, or the renewal of that policy, in terms of the extent of disclosure requirements. Rather the regulations require that “every insurance policy placed with an unauthorized insurer . . . shall bear across its face” the specified legend. (11 NYCRR 27.18 [a].)
Both defendants cite numerous cases for the proposition that insurance brokers are nonprofessionals and have limited duties beyond obtaining the requested coverage on behalf of the insured, and absent special circumstances, which allegedly do not exist here, brokers generally have no continuing duty to advise. (See Chase Scientific Research v NIA Group, 96 NY2d 20, 30 [2001]; Murphy v Kuhn, 90 NY2d 266, 270 [1997].) Relying on Murphy, Kaye maintains that it discharged its duty as a matter of law to the Nightclubs by recommending Legion, which had a rating of “A” by Best’s Insurance Rating Services and a financial strength rating of 9 on a scale of 1 to 15, signifying that Legion was an excellent carrier, and by informing the Nightclubs in writing on April 10, 1999 of Legion’s nonadmitted status.
Murphy is not analogous to the extent that Murphy involved the alleged negligent failure of defendant insurance agent to advise plaintiff as to possible additional insurance coverage needs (id. at 270), whereas the alleged negligence here is partially based on failure to comply with statutorily imposed disclosure requirements for excess line brokers under the Insurance Law. Moreover, the Insurance Law explicitly treats those *385 brokers who procure insurance from unauthorized carriers as distinct from other insurance brokers, statutorily imposing on them certain obligations, including strict disclosure requirements. Irrespective of the selection of the carrier itself, Kaye was still under a statutorily imposed duty to comply with the Insurance Law’s disclosure requirements which Kaye has simply failed to demonstrate as a matter of law in its submissions in support of its motion for summary judgment.
As for Setnor, despite acknowledging that it began servicing Kaye’s accounts in September of 1999, purchasing the Nightclubs’ account in March of 2000 pursuant to a purchasing agreement, renewing the Nightclubs’ policy on March 28, 2000, Set-nor maintains that it owed no duty to plaintiffs with respect to the first policy Kaye placed with Legion, and that it neither changed nor amended this policy when it was renewed in March of 2000. Notably absent from Setnor’s papers is a copy of the insurance policy it indisputably sent to the Nightclubs in September of 1999, or the renewal of that policy, sent two years later. Kaye does submit a copy of the insurance policy produced to plaintiffs by Setnor on October 29, 1999. The copy of the insurance policy does not display the specified legend required under 11 NYCRR 27.17 and 27.18, however. Rather, the letter of enclosure attached to the policy states, “Due to the nature of your business and the restricted availability of insurance from the standard marketplace, we have secured coverage for you through a surplus line[ ] insurer.” The substance of this letter, which effectively functions as “written confirmation of placement of coverage with an unauthorized insurer” under section 27.17 (a), clearly falls short of the duty of excess line and producing brokers to disclose, “in no less than ten point bold red type,” the specified legend. (11 NYCRR 27.17 [b].)
Neither does this policy escape the specific disclosure format requirements of section 27.18 because it is a renewal. As discussed above, the disclosure requirements imposed on excess line and producing brokers apply to all insurance policies, irrespective of whether they are renewals, and no exceptions to this rule are enumerated in the statute. The court is not inclined to read such an exception into the statute. Accordingly, as with Kaye, discussed above, the court is not prepared to rule as a matter of law whether a violation of the applicable provisions of the Insurance Law and regulations occurred without the opportunity to inspect the insurance policies Setnor sent to plaintiffs.
*386 B. Availability of a Private Cause of Action for Violation of Insurance Law
Although not immediately evident due to poor drafting, plaintiffs’ amended complaint and opposition papers appear to assert a private cause of action for violation of the Insurance Law and regulations, treating noncompliance with its provisions as “negligence per se.” Although Insurance Law § 2118 imposes a statutory duty on excess line brokers to use due care in selecting an unauthorized carrier, and further requires that diligent effort be made to first place coverage with an authorized carrier, the statute itself contains no language which confers a private cause of action to enforce its provisions (Hudes v Vytra Health Plans Long Is., 295 AD2d 788, 788-789 [3d Dept 2002], lv denied 99 NY2d 505 [2003]), and no court has yet to recognize a private cause of action for violation of these specific provisions.
Similarly, courts have consistently rejected recognizing a private cause of action for other provisions of the Insurance Law. (New York Univ. v Continental Ins. Co., 87 NY2d 308, 317-318 [1995] [Insurance Law § 2601 does not permit a private cause of action in favor of the insured]; Bettan v Geico Gen. Ins. Co., 296 AD2d 469, 470 [2d Dept 2002], lv dismissed 99 NY2d 552 [2002].) Moreover, while rejecting a private cause of action for violation of Insurance Law § 2601, which is otherwise not applicable here, courts have frequently found for plaintiffs against noncompliant brokers almost unfailingly in the context of a broader claim for common-law negligence, rather than for violation of an Insurance Law provision. (Murphy v Kuhn, 90 NY2d 266, 270 [1997].)
As plaintiffs have failed to establish that the applicable provisions and regulations confer a private right of action, plaintiffs must otherwise demonstrate that a private cause of action arises by “implication from the statutory scheme” in order to succeed on a claim for negligence per se. (Hudes, 295 AD2d at 789.) Therefore, plaintiffs must establish that (1) they are part of the class for whose particular benefit the statute was enacted, (2) recognition of a private cause of action would promote the legislative purpose, and (3) creation of a private cause of action would be consistent with the legislative scheme. (Id.)
As for the first prong of the negligence per se analysis, the statutory licensing scheme was “enacted to cure some of the problems raised by the prior practice of brokers placing excess line insurance with companies not subject to the regulatory *387 powers of this State, and was aimed at protecting the insured.” (People v Condor of Ams., 43 Misc 2d 899, 902 [Sup Ct, NY County 1964], affd 23 AD2d 822 [1st Dept 1965].) Plaintiffs are part of the class for whose benefit the statute" was enacted. However, while recognizing a private right of action at this juncture “might arguably promote [an] aspect of a statute’s legislative goals, the greater concern is the consistency of doing so with the purposes underlying the statutory scheme.” (Hudes, 295 AD2d at 789 [internal quotation marks omitted].)
The greatest concern in the analysis of whether to imply a private cause of action in a statute is to avoid “unwarranted interference with the legislative scheme.” (Id.) Accordingly, “where a regulatory agency has either been selected or, in fact, serves to administratively enforce the duties created by a statute, a private right of action should [ordinarily] not be judicially sanctioned.” (Id. [internal quotation marks omitted].) Plaintiffs thus fail on the second and third prongs of the analysis, as the Superintendent of the Insurance Department has broad regulatory powers over excess line brokers. Moreover, the relevant provisions at issue provide penalties, such as suspension or revocation of an excess line broker’s license, when “in his [the Superintendent’s] judgment such suspension or revocation will best promote the interests of the people of this state.” (Insurance Law § 2105 [a].)
Accordingly, as implying a private right of action for violation of the relevant provisions of the Insurance Law and regulations would interfere with the legislative scheme that already provides for review and penalty by the Superintendent of the Insurance Department, the court holds that while compliance with the procedures of article 21 of the Insurance Law and the corresponding regulations is essential in the exercise of due care and diligence required of excess line brokers who place coverage with unauthorized carriers, and failure to comply is evidence of some negligence (Matter of B. & R. Excess Corp. v Thacker, 37 Misc 2d 307, 308 [Sup Ct, NY County 1962], affd 18 AD2d 1137 [1st Dept 1963]), it does not otherwise constitute negligence per se, as plaintiffs maintain.
Plaintiffs’ insistent reliance on Jamaica Bay is misplaced (Jamaica Bay Riding Academy v William F. Slack, Inc., 204 AD2d 398 [2d Dept 1994]). There, violation of the Insurance Law comprised but one component of a larger and more egregious negligence claim: defendants had procured an insurance policy with a carrier that was not only an unauthorized carrier, but at the time of binding was entirely insolvent.
*388 In contrast, Legion was solvent and had been successfully-paying plaintiffs’ claims for three years prior to insolvency, which occurred in March of 2002, and the policy was renewed by plaintiffs during this time, in March of 2000. Moreover, at the time of binding, Legion’s disclosed financials and then-current “A” rating in Best’s Insurance Reports placed the provider within the top third of the nation’s insurance operating companies, and rendered Legion a suitable choice for plaintiffs if, in fact, Kaye could not place coverage with an authorized carrier due to plaintiffs’ significant loss history. While Legion was otherwise financially sound and solvent, the applicable provision requires the filing of an affidavit to the excess line association detailing the broker’s “diligent effort” in placing with an authorized carrier. (Insurance Law § 2118 [b] [3] [A].) Kaye maintains that it did attempt, but ultimately failed, to place plaintiffs’ coverage with an authorized carrier prior to binding with Legion. Defendants make no mention of the required affidavits detailing this effort, and neither submit a copy of this affidavit nor allege that it was ever filed. Therefore, as stated above, the court is unable to rule as a matter of law that Kaye discharged its duties to undertake “diligent effort[s]” under Insurance Law § 2118 (b) (3) (A).
Hammond, also relied on by plaintiffs, is similarly inapposite (Hammond v Hunkele, 170 AD2d 484, 484 [2d Dept 1991]). There, the Court granted summary judgment for the insured on grounds that defendants assisted placing coverage with an unauthorized carrier and treated noncompliance with Insurance Law § 2117 as uncontroverted proof of negligence where defendants otherwise offered no evidence of triable issues of fact that it was not negligent.
Here, unlike in Hammond and Jamaica Bay, Kaye attempted to place coverage with an authorized carrier but was unable to. Moreover, Kaye notified plaintiffs of Legion’s unauthorized status. While the notification provided by the letter of April 21, 1999 may have been insufficient under the statutory disclosure requirements of the Insurance Law discussed above, some notification was given, Legion was solvent at the time of binding and all indications suggested that it was financially sound, and finally, defendants did attempt to bind with an authorized carrier.
Moreover, the only actions relying solely on violation of the Insurance Law to establish negligence on the part of brokers emerge from actions brought by either the State Insurance *389 Department or its Superintendent. (See Matter of Rosen v Levin, 259 AD2d 395 [1st Dept 1999] [determination of Superintendent that excess line broker violated Insurance Law and regulations by filing affidavits on behalf of a producing broker unlicensed to procure excess line coverage and imposing on him a $7,500 civil penalty for these violations was neither irrational nor unreasonable]; Matter of Cleveland v Department of Ins., 206 AD2d 659 [3d Dept 1994] [subsequent to the Insurance Department’s refusal to stamp an excess line broker’s affidavits it filed on behalf of an out-of-state broker because coverage was the type excess line brokers are not permitted to place, the excess line broker sought review in a formal disciplinary hearing before the Superintendent, who found that he was in violation of the Insurance Law for failing to verify that the coverage the insured requested was not obtainable in New York, and for aiding an unlicensed broker to place excess line insurance; the court thereafter remitted the matter to the Insurance Department for a determination of a penalty].)
Accordingly, plaintiffs have failed to establish that a private right of action for violation of the relevant provisions of the Insurance Law and regulations exists or that violation of the disclosure requirements imposed on excess line brokers constitutes negligence per se. While it remains disputed whether Kaye and Setnor complied with the applicable Insurance Laws and regulations imposed on excess line brokers, plaintiffs’ claim for common-law negligence still does not survive summary dismissal of this claim, for the reasons discussed below.
C. Common-Law Negligence
To establish a prima facie case of negligence under common law, plaintiffs must demonstrate that defendants owed a duty, committed a breach, and plaintiffs suffered an injury proximately caused by defendants’ breach. (Solomon v City of New York, 66 NY2d 1026, 1027 [1985].) Aside from alleging breach of its duty of due care to plaintiffs by failing to comply with statutory disclosure obligations, plaintiffs 'maintain that Kaye breached the heightened duty that existed, based on the parties’ special relationship, by not advising plaintiffs of the nature and consequences of excess line placement coverage, and for failure to use reasonable care in selecting an appropriate insurer. Plaintiffs’ arguments fail, however, due to the absence of facts sufficient to raise a triable issue of fact warranting a trial.
As for its assertion that a “special relationship” existed between it and Kaye, plaintiffs fail to adduce facts sufficient to create a triable issue of fact.
*390 Generally, insurance brokers’ procurement duty is defined by “the nature of the customer’s request for coverage.” (M & E Mfg. Co. v Frank H. Reis, Inc., 258 AD2d 9, 11 [3d Dept 1999] [summary judgment granted in favor of insurance agent where plaintiff assumed, but did not request, an increase in one component of coverage].) Moreover, in Murphy, while strictly limiting the common-law duty of insurance brokers, the Court acknowledged that heightened duties may arise in the context of special relationships. (Murphy v Kuhn, 90 NY2d 266, 270 [1997].) Drawing upon the findings of other jurisdictions, Murphy extracts three circumstances that may give rise to a “special relationship,” none of which exist here, imposing upon an agent a duty beyond mere procurement: (1) where the agent receives compensation for consultation apart from payment of premiums, (2) interaction between the agent and the insured regarding specific questions of coverage, and (3) an extended period of dealings. (Id. at 272-273.)
In Murphy, the plaintiff brought a negligence action against his long-time insurance broker for failure to increase coverage despite plaintiffs own failure to request such an increase. (Id. at 269.) In determining whether or not the broker owed a heightened duty of care to plaintiff, the court found neither the existence of a special relationship nor a special duty despite the parties’ nearly 20-year history of insurance dealings. (Id. at 271.)
Plaintiffs do not allege nor submit any documentary or testamentary evidence suggesting that Kaye’s agent, Haupert, received any additional compensation for his procurement of insurance coverage. Plaintiffs also fail the second prong of the “special relationship” test, as both Ouellette and Haupert attest, neither plaintiffs nor Kaye entered into discussions at any point regarding specific questions of coverage. Rather, according to Ouellette, the parties’ “understanding” was never explicitly communicated. Finally, according to the dates recited in Ouellette’s deposition, Kaye’s business relationship with plaintiffs was roughly one month old at the time Kaye procured the original Legion policy; therefore, there was no extended period of dealings. Accordingly, plaintiffs have failed to satisfy the Murphy criteria, and have otherwise failed to demonstrate the existence of a heightened duty based on the existence of a special relationship.
Moreover, even assuming that plaintiffs did demonstrate the existence of a special or heightened duty, plaintiffs effectively *391 ratified the policy, and are therefore unable to demonstrate that a breach of this duty, if such a duty existed, in fact occurred. The insured, as principal in the transaction, may effectively ratify acts of its agents or apparent agents and, therefore, may be presumed to have assented to the policy’s terms. (Busker on Roof Ltd. Partnership Co. v Warrington, 283 AD2d 376, 377 [1st Dept 2001]; Imero Fiorentino Assoc. v Green, 85 AD2d 419, 421 [1st Dept 1982].) Moreover, the First Department has applied the doctrine of ratification to insurance brokerage transactions. (Paramount Ins. Co. v Brown, 205 AD2d 464, 465 [1st Dept 1994]; Busker, 283 AD2d at 377.) In Paramount, the Court stated that where
“the defendant [insured], by retaining the third-party defendants as the original insurance broker, renewing the policy, without objection, for three successive years, and, after the second renewal, discharging the original insurance broker and replacing it with a substitute broker, and by retaining the policies and paying the advance premiums thereon for four successive years, ratified the actions of the insurance broker and is estopped from denying the validity of the insurance contracts.” (Paramount, 205 AD2d at 465.)
Similarly, the Busker court held that the plaintiff, having received an insurance policy through a broker several months prior to injury, was presumed to have assented to its recited terms, and had no claim against the procuring broker. (Busker, 283 AD2d at 377.)
Plaintiffs here effectively ratified Kaye’s placement of insurance with an unauthorized carrier through both affirmative acts and failure to repudiate the policy. At the outset, Kaye’s notice of excess line placement, signed by Ouellette on May 10, 1999, constitutes documented communication of the material facts necessary for valid ratification. Upon receiving notice of Legion’s unauthorized status, Ouellette neither rejected the procured policy nor communicated to Kaye the Nightclubs’ desire to obtain coverage only with an authorized carrier.
Still further, plaintiffs affirmatively ratified Kaye’s initial placement by renewing the purportedly insufficient Legion policy the following year, well after receiving notice of its unauthorized status. Finally, in 2001 the plaintiffs, through another broker, replaced the Legion policy with coverage provided by another unauthorized carrier. Plaintiffs’ actions and omissions, in light of their knowledge of the pertinent material facts, clearly *392 constitute ratification under the standards set forth in Busker and Paramount.
Defendant Setnor’s cross motion seeks dismissal of all claims against it for damages arising prior to March 23, 2000, hinging on the terms of its service and purchase agreements with Kaye, whereby Setnor assumed full control of the Nightclubs’ account only in March of 2000. However, it is unnecessary to delve into the specific contractual provisions to decide when Setnor’s liability may attach, as irrespective of whether defendants complied with the disclosure requirements of the Insurance Law and regulations, the final element in the negligence analysis, proximate cause, requires a showing by plaintiffs that the insurance they sought was available and would have been procured but for defendant’s negligence in selecting an unauthorized carrier (MacDonald v Carpenter & Pelton, 31 AD2d 952, 953 [2d Dept 1969]). Even if plaintiffs establish that defendants did fail to comply with the disclosure obligations of the applicable Insurance Law provisions and regulations, plaintiffs fail to establish that defendants’ negligence was the proximate cause of their injury.
In MacDonald, the Court refused to find proximate cause on a negligence claim where the defendant broker failed to obtain requested coverage, despite representations that he had so obtained, because plaintiff was still required to show that it would have procured the insurance which it sought but for defendant’s statements, which plaintiff was otherwise unable to demonstrate. (MacDonald, 31 AD2d at 953.)
Here, the Nightclubs are unable to demonstrate proximate causation in accord with MacDonald's requirement. For one, plaintiffs admit that their most recent coverage prior to 1999 was obtained through an unauthorized carrier, and have produced no evidence that authorized carriers covered the Nightclubs in the more distant past. Further, a former officer of Lexington, Stephen Andrick, in an affidavit dated February 1, 2005, indicates that the insurer terminated the Nightclubs’ casualty policy on the basis of plaintiffs’ excessive loss history. During the course of the 1998-1999 policy, Lexington paid out $719,000 in losses on plaintiffs’ behalf, while receiving only $298,915 in premium payments.
Haupert’s affidavit, dated February 1, 2005, likewise establishes that the nightclub industry has proven “historically difficult to insure” due to a typically large number of claims. These general comments are confirmed by the April 21, 1999 “Notice *393 of Excess Line Placement” that he authored, which notes that Kaye’s best efforts to secure the Nightclubs’ placement with an authorized insurance carrier had failed. Accordingly, as plaintiffs have not demonstrated that they would have obtained coverage with an authorized carrier but for defendants’ negligence, plaintiffs fail to establish that defendants’ negligence was a proximate cause of their injury. Finally, notwithstanding their inability to demonstrate proximate cause, plaintiffs’ claims are time-barred by the three-year statute of limitations.
D. The Applicable Statutory Limitations
1. CPLR 214 (4), (6) and 213 (2)
Three provisions of the CPLR govern the time limitations applied to actions based on tort and contract. Section 214 (4) establishes a standard three-year time limit for “any injury to property” not attributable to bodily exposure to substances. (CPLR 214 [4].) Section 213 (2) imposes a six-year limit on claims related to express or implied contractual obligation (CPLR 213 [2]); however, plaintiffs’ opposing papers concede the inapplicability of CPLR 214 (6) to insurance brokers; therefore the court will discuss the applicability of CPLR 214 (4) to plaintiffs’ negligence claim only. Additionally, defendants concede that plaintiffs’ breach of contract cause of action was timely commenced in accordance with CPLR 213 (2).
2. Date of Accrual under CPLR 214 (4)
While New York law generally establishes that a cause of action in tort accrues upon the date of the injury complained of (Venditti v Liberty Mut. Ins. Co., 6 AD3d 961, 962 [3d Dept 2004]), fixing a precise accrual date for plaintiffs’ negligence claims proves challenging. Plaintiffs, relying on Venditti, contend that accrual can be fixed no earlier than the commencement of Legion’s insolvency proceedings in April of 2004. Plaintiffs presumably argue that only following Legion’s insolvency did an injury occur, and thus only then did the cause of action ripen into a litigable claim, rendering their filing in late 2004 timely.
In contrast, defendants fix accrual with the date that the specific injury giving rise to plaintiffs’ complaint occurred. Here, that date is when the policy was allegedly negligently issued, lacking the required disclosure of excess line placement. Defendants rely on Dolce to support their contention that, in a negligence action based on failure to comply with Regulations of the Insurance Department, accrual begins the date the policy *394 was issued. (Dolce v Northwestern Mut. Life Ins. Co., 272 AD2d 432 [2d Dept 2000], lv denied 95 NY2d 761 [2000].)
The current action’s convoluted fact pattern renders fixing an accrual date more challenging than either plaintiffs or defendants’ arguments suggest, however. In the historical case of Northrop v Hill, the Court of Appeals weighed whether the accrual in a fraudulent property sale occurred at the time of the seller’s misrepresentation, or at the time the deceived purchaser was evicted from the property years later. (Northrop v Hill, 57 NY 351, 353 [1874].) Preliminarily, the Court pondered the relationship between the wrong complained of and subsequent damages:
“If the subsequent damages developed a new cause of action the statute has not barred his claim. On the other hand, if the original wrong contained within itself the complete cause of action, and the resulting loss was merely an aggravation of damages, the claim was barred by the statute” (id.).
Analogizing to an earlier case involving breach of an implied contract, the Northrop court held that the plaintiffs fraud claim accrued on the date of the deceptive sale, after which reparation became due to the plaintiff, whether or not he immediately pursued it. (Id. at 355.) In Northrop, the Court heavily emphasized plaintiffs subsequent discovery of the wrong and the time elapsed between that discovery and the eviction that gave rise to the cause of action. (Id.) Upon discovery of the fraud, the Northrop plaintiff was entitled to refund of the sale price; after the fraud claim lay dormant for more than six years and the property was forced into foreclosure, plaintiff had suffered damages well in excess of the original sale price. (Id. at 359.) In the Court’s view, the plaintiffs delay in seeking relief compounded the original damages, but otherwise did not alter that the wrong occurred on the date of the deceptive sale. (Id.)
More recent cases concerning insurance claims have affirmed Northrop's core holding without belaboring the underlying analysis. (See Mauro v Niemann Agency, 303 AD2d 468, 469 [2d Dept 2003] [fixing accrual at first issuance of insurance policy where plaintiff maintained defendant insurance broker’s negligence resulted in loss of a right to greater coverage than broker obtained]; Cappelli v Berkshire Life Ins. Co., 276 AD2d 458, 459 [2d Dept 2000] [measuring accrual of plaintiff’s negligence claim against insurer from the date of the policy’s purchase, and not when plaintiff was required to pay additional premiums or when the policy was cancelled years later].)
*395 Here, plaintiffs’ discovery of Legion’s unauthorized status can be fixed at the very latest at May 10, 1999, when Mr. Ouellette signed Kaye’s notification of excess line placement. Plaintiffs took no action in response to the discovery, effectively assuming the risk associated with the placement. Immediately following the alleged violation of Insurance Law, but prior to Legion’s insolvency, the current plaintiffs perhaps became entitled to a refund of Kaye’s fees, but certainly not to the damages now sought. The case in this sense parallels Northrop, where discovery of the original wrong took place well before the specific damages sought became available. While the fact patterns at issue — separated as they are by more than a hundred years — are distinguishable, in both cases accumulated damages relate to a single wrong or injury of which the plaintiff became aware well prior to seeking relief. Under both the definitive holding of Northrop and Dolce, accrual of the cause of action took place at the date of the alleged failure to comply with statutory disclosure requirements and for negligent selection of an unauthorized carrier, both of which occurred, in 1999, and plaintiffs’ negligence action is thus time-barred under CPLR 214 (4).
II. Breach of Contract
Plaintiffs concede that the parties at no time entered into a written contract for procurement of insurance brokerage services. Actions seeking to enforce a broker’s liability may be brought under either a written contract or an oral agreement to procure coverage. (Kinns v Schulz, 131 AD2d 957, 959 [3d Dept 1987].) Moreover, where plaintiff relies on oral representations, liability is not otherwise barred by the Statute of Frauds. (Kinns, 131 AD2d at 957.) In order to be generally enforceable, an oral agreement must arise by mutual assent and its terms must be sufficiently certain or definite. (Ruppert v Long Is. R.R. Co., 281 AD2d 466, 467 [2d Dept 2001].) Omission of contractual terms, like indeterminacy, may render an agreement unenforceable. (Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp., 93 NY2d 584, 590-591 [1999], rearg denied 93 NY2d 1042 [1999].) Moreover, summary judgment is appropriate where a movant demonstrates fatal insufficiency of an oral contract’s terms and the opposing party fails to raise a triable issue of fact to the contrary. (Ruppert, 281 AD2d at 467.)
Here, both parties recognize that an oral agreement was formed whereby Kaye (and later Setnor) would obtain insurance coverage for the plaintiffs in the capacity of insurance broker. Notwithstanding Ouellette’s self-serving affidavit, plaintiffs *396 have failed to demonstrate that Ouellette or any other agent communicated any detail concerning the desired coverage beyond requesting an “appropriate policy.” These facts all but compel the finding that the parties reached no “meeting of the minds” in regard to plaintiffs’ specific insurance needs, and thus forged no contractual relationship with enough determinacy rendering the alleged agreement enforceable. Even viewing the circumstances in the light most favorable to plaintiffs, the only viable contract between plaintiffs and defendants was for procurement of insurance coverage, a promise defendants honored in placing the Nightclubs’ policy with Legion. Accordingly, plaintiffs have failed to raise a triable issue of fact that defendants breached an oral contract, and thus summary judgment is appropriate.
Accordingly, it is ordered that Kaye’s motion for summary judgment dismissing the complaint, all cross claims and third-party claims against it are granted; and it is further ordered that Setnor’s cross motion for summary judgment dismissing the complaint in its entirety and all cross claims against it are granted; and it is further ordered that the remaining fourth-party complaint asserting claims for common-law indemnity and contribution against Ouellette and Do The Hustle is hereby dismissed as moot.

. The complaint names 20 Polly Esther’s and Boom Batta, Inc. affiliated nightclubs, incorporated in various states and cities.

. The common insurance industry vernacular “admitted” carries the same meaning as the statutory term “authorized,” while “non-admitted” carries the same meaning as “unauthorized.” (2004 NY Insurance GC Opinions LEXIS 87, at 1-2 [Apr. 2, 2004].)

. Under Insurance Law § 2105, the Superintendent of the Insurance Department has discretionary authority to grant an excess line license to *380 abroker already licensed as an insurance broker, provided that the licensed excess line broker adhere to the strict statutory regiment provided in the Insurance Law. (Insurance Law § 2105 [a].) The Superintendent may suspend or revoke the license for noncompliance. (Id.)

. The legend must appear in no less than 10-point bold red type.

. A “producing broker” is defined under the Insurance Regulations as “any person ... or corporation who or which acts as an insurance broker, other than the excess line broker.” (11 NYCRR 27.1 [m].) In practice, the producing broker is also known as the “retail broker,” who works with the excess line broker to procure a policy on behalf of the insured.
Insurance Law §§ 2105, 2118 and 11 NYCRR 27.21 precludes a licensed excess line broker from filing affidavits, discussed at length below, with the excess line association on behalf of a producing broker unlicensed to procure excess line coverage. (Matter of Rosen v Levin, 259 AD2d 395, 395-396 [1st Dept 1999].) The court interprets Rosen as requiring a producing broker to be licensed to procure excess line coverage. Additionally, the excess line broker who works with the producing broker must be licensed.

. The Insurance Law elaborates that a broker’s “diligent effort” means three attempts, followed by three declinations, to place coverage with an authorized insurer prior to placement with an unauthorized insurer. (Insurance Law § 2118 [b] [4].)

. While Kaye submits a copy of its insurance broker license, it does not indicate that Kaye is also licensed to broker excess line insurance, required under Insurance Law §§ 2105 and 2117 (h). Rather the license submitted indicates that Kaye is licensed to broker fire, casualty, fidelity and surety, baggage, credit, inland and ocean marine insurance.

. Plaintiffs’ claim that the Insurance Law and regulations additionally require “pre-binding disclosure” is unavailing and unsupported by the provisions themselves. Neither do plaintiffs substantiate this claim by citations to statutes or cases supporting this argument.